**Opinion issued September 17, 2015**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-14-01018-CV

———————————

### RICKY D. PARKER AND JAMES MYERS, Appellants

### V.

### SCHLUMBERGER TECHNOLOGY CORPORATION, Appellee

---

On Appeal from the 268th District Court
Fort Bend County, Texas
Trial Court Case No. 14-DCV-218252

---

### O P I N I O N

Schlumberger Technology Corporation ("STC") sued Ricky Parker and James Myers, respectively, the owner and the lead employee of a company STC had purchased, seeking to enforce their covenants not to compete and to recover damages based on related alleged torts. Relying on an arbitration provision

contained in STC's asset purchase agreement for the company, Parker and Myers moved to compel arbitration. STC opposed arbitration and also sought a temporary injunction to enjoin Parker and Myers from competing with it. The trial court denied the motion to compel arbitration and granted an injunction. Parker and Myers appealed both interlocutory orders. Parker and STC settled while the case was on appeal, leaving Myers as the remaining appellant. We reverse and remand.

## Background

### *Relevant Agreements*

Parker was the sole stockholder of Parker Energy Services, an Oklahoma-based oilfield services company that sold line equipment services to companies that operate in the oilfield. Parker and Myers were employees of Parker Energy; after Parker, Myers was Parker Energy's "number one person."

On September 9, 2011, in contemplation of a later acquisition by STC, Parker sold the assets of Parker Energy to Production Wireline and Cased Hole Services Group, LLC, STC's predecessor-in-interest. To consummate the sale, Production Wireline, Parker Energy, and Parker in his individual capacity each signed an Asset Purchase Agreement, or APA. After the sale, STC acquired Production Wireline by merger; thus, STC is the successor-in-interest to the assets

2

that Production Wireline purchased from Parker Energy and all of Production Wireline's rights under the APA.

The APA included a covenant not to compete and a non-solicitation provision that, among other provisions, required Parker and key Parker Energy employees, including Myers, to execute standard employment forms that included covenants not to compete. Specifically, Article IX of the APA required, as a condition precedent of closing, that all Parker Energy employees to whom Production Wireline had made offers of employment "have executed and delivered [Production Wireline's] standard employment documentation for new hires." The parties agree that Production Wireline's Intellectual Property, Confidential Information, and Non-Compete Agreements, or "ICN agreements," were part of this "standard employment documentation." As another condition precedent, Article IX of the APA also required Myers to "have executed and delivered to [Production Wireline] a retention bonus contract substantially in the form of Exhibit C" to the APA. As the APA required, Parker and Myers agreed to these standard employment forms, including the ICN agreements.

The ICN agreements signed by each of Parker and Myers provided that the employee would "not publish or disclose or transfer to any person, other than in the proper performance of Employee's duties for the Company, or use in any way other than in Company's business, any trade secrets or confidential technical or

3

business information or material of Company—including Company Intellectual Property and Company Confidential Information, either during or after employment with Company." The ICN agreements defined "Company Intellectual Property" broadly to include patents, trademarks, copyrights, trade secrets, lists, know-how, and a range of other concepts and property interests. Similarly, "Company Confidential Information" included, among other things, "client lists, client preferences, client needs, client designs, . . . pending projects and proposals, . . . information relating to employees . . . project knowledge, [and] other valuable confidential information."

The ICN agreements also restricted each employee's actions post-employment, providing,

> In order to protect [Production Wireline] against any unauthorized use or disclosure of Company Confidential Information, and in exchange for the Company's promise to provide Employee with access to Company Confidential Information and other consideration . . . Employee agrees that for a period of one (1) year following the date of termination of his/her employment with Company, Employee will not directly or indirectly work for or assist (whether as an owner, employee, consultant, contractor or otherwise) any business or commercial operation whose business is—even in part—in direct or indirect competition with any area of the Company's business in which Employee was employed by Company.

The ICN agreements further provided,

> Employee agrees that while employed by Company, and during the one-year period following the termination of his/her employment, Employee will neither directly nor indirectly, on his/her own behalf or on behalf of any person or entity, in any capacity, recruit, hire, solicit,

4

or assist others in recruiting, hiring, soliciting any person, who is, or was, during the period of Employee's employment with Company, an employee or consultant of Company.

As the APA further required, Myers also executed a "Retention Bonus Contract." Like the ICN agreements, the Retention Bonus Contract contained terms prohibiting Myers from disclosing confidential information. It also prohibited Myers from competing with Production Wireline during his employment and for a period of one year afterward; he would not "solicit, contact [sic] or accept work, which is the same or substantially similar to work and/or services performed by [Myers] for [Production Wireline], from clients of [Production Wireline] with whom [Myers] had business dealings during [his] employment with [Production Wireline]." It further stated that he would not "provide services (including consulting services)" to such clients during that period, nor could he "solicit, recruit, encourage, hire or assist any other person or entity to solicit, recruit, encourage or hire for employment any other employee or independent contractor to work for a competitor of the Company." Myers further agreed that, during his employment and for a period of one year afterward, he would "not directly or indirectly own, manage, operate, control, be employed by, be a consultant for, or perform any job functions for, any business that is in competition with [Production Wireline]" in the geographic areas served by the

Production Wireline office where he worked during his final year of employment with the company.

The APA also contained an arbitration clause. The ICN agreements and the Retention Bonus Contract did not. Specifically, the APA provided in relevant part:

> Any controversy, dispute or claim arising under or in connection with this Agreement[1] (including, without limitation, the existence, validity, interpretation or breach hereof and any claim based on contract, tort [or] statute) shall be resolved by a binding arbitration, to be held in Houston, Texas pursuant to the Federal Arbitration Act and in accordance with the then-prevailing Commercial Arbitration Rules of the American Arbitration Association (the "AAA").

The APA carved out claims for injunctive relief, however, in the event that any party violated its non-compete or non-solicitation provisions. It provided, "the remedy at law for any breach of [those provisions] will be inadequate and . . . [Production Wireline], in addition to any other relief available to it, shall be entitled to temporary and permanent injunctive relief without the necessity of proving actual damage or posting any bond whatsoever." It also provided that Production Wireline would "be entitled to an injunction, restraining order, or other equitable relief from any court of competent jurisdiction in the event of any breach" of the non-compete or non-solicitation provisions.

---

[1] "Agreement" was defined by the APA as meaning the APA itself, specifically the "Asset Purchase Agreement, dated as of September 9, 2011."

*Parker and Myers leave STC*

Parker retired from STC on October 2, 2013. After Parker's retirement, Myers took charge of STC's line work in Texas, Oklahoma, Louisiana, Arkansas, Pennsylvania, Ohio, West Virginia, and New York. Myers retired from STC effective September 16, 2014.

After he retired, Parker founded Professional Wireline, LLC, a company providing the same services that Parker Energy had provided and that STC continued to provide through Production Wireline. In deposition testimony, Parker admitted that Professional Wireline competed with STC in providing line services and that it had solicited STC customers and employees immediately after Myers's retirement from STC on September 16, 2014. Thus, Professional Wireline began soliciting STC customers and employees about 2 weeks before the covenants not to do so in Parker's ICN agreement expired,[2] and roughly a year before Myers's covenants expired. Parker also admitted that he had ordered six wireline trucks in December 2013 or January 2014, in planning to compete with STC. Parker testified that he had ordered the trucks because he knew that STC employees eventually would join Professional Wireline.

---

[2] The APA, of which Parker was a signatory, contains comparable restrictions. We do not address those provisions of the APA, however, as STC has not sought enforcement of them in this suit.

7

While he was still employed at STC, Myers took a variety of actions to assist Parker with his competing business, Professional Wireline. For example, Myers procured and tested equipment and tools and executed Master Service Agreements with STC customers. The day after Myers retired from STC, eleven STC employees who worked in slick line operations resigned their positions, all to begin employment with Professional Wireline. Those employees represented nearly half of the 23 employees whom Myers had supervised before leaving STC.

### STC sues and seeks injunctive relief

On October 8, 2014, about two weeks after Myers retired, STC sued Parker and Myers in the underlying case in district court in Texas. STC alleged claims for breach of contract, tortious interference with existing contracts, tortious interference with prospective business relationships, breach of fiduciary duty, and aiding and abetting breach of fiduciary duty. It sought actual damages and injunctive relief prohibiting Parker and Myers from violating their covenants not to compete and not to solicit STC employees or clients, as well as prohibiting them from disclosing or using STC's trade secrets or confidential information in any ways that would violate their ICN agreements.

After it filed suit, STC initially acknowledged that its claims against Parker and Myers were based on the APA. In a demand letter dated October 29, 2014, STC requested "specific performance of certain portions of the APA," and stated

8

that it was providing Parker and Myers "with an opportunity to cure breaches of other portions of the APA." The letter specifically referenced a number of portions of the APA: (1) the definition of "Purchased Intellectual Property"; (2) Section 2.1, defining "Purchased Assets"; (3) Section 2.5, governing any necessary post-closing conveyances to further the purposes of the APA; (4) Section 2.7 and Schedule 2.7, allocating the majority of the purchase price for Parker Energy to goodwill; (5) Section 7.10, prohibiting further use by Parker or Parker Energy of the Parker Energy mark and name; (6) Section 12.3, the arbitration provision; and (7) Schedule 3.3, regarding physical equipment to be transferred to STC.

In its letter, STC complained that Parker and Myers had diluted the goodwill conveyed "under the APA," and had used "a deceptively similar name to the trade name [they] sold in the APA." STC complained that "the tool boxes in the truck used by Mr. Myers . . . were Purchased Assets on Schedule 3.3 of the [APA] and must be returned along with all of the tools contained in the boxes." The letter also demanded that Parker Energy and Parker "mak[e] sure that James Myers . . . compl[ies] with [his] obligations under [the] agreement [he] signed which [was] referenced in the APA." The letter concluded, "If you fail to cure the breaches of the [APA], the likely next step will be to proceed to arbitration under Section 12.3 of the [APA]."

In response, on November 26, 2014, Parker, Myers, and Parker Energy initiated an arbitration proceeding against STC before the American Arbitration Association, the governing arbitral forum provided in the APA. They then moved in the trial court to compel arbitration of all of STC's claims. They also argued that, pursuant to the parties' agreement, the arbitrators, not the trial court, must determine whether the arbitration agreement governed the claims between the parties. They attached their arbitration demand, which included STC's demand letter and excerpts from the APA, but they did not attach a complete copy of the APA. STC responded that the arbitration provision in the APA did not apply to STC's claims, that it sought relief only under the ICN agreements and the retention bonus contract, and that none of these agreements contained an arbitration clause.

The trial court heard and orally denied the motion to compel arbitration. It immediately proceeded to hear STC's request for a temporary injunction, during which it admitted a complete copy of the APA into evidence. Also during the temporary injunction hearing, Parker and Myers re-urged their arbitration demand, arguing that the APA, having been admitted into evidence, required the trial court to compel arbitration. About two weeks after the hearings began, the trial court formalized its rulings with signed written orders denying Parker and Myers's motion to compel arbitration and motion for reconsideration and granting STC's request for a temporary injunction.

*Terms of the injunction*

Among other provisos, the temporary injunction prohibited Parker and Myers from disclosing confidential information or taking any of the following actions:

5.  [Parker and Myers] shall not directly or indirectly recruit, hire, solicit, or assist others in recruiting, hiring, or soliciting employees of [STC].

6.  [Parker and Myers] shall not directly or indirectly work for, or assist (whether as an owner, employee, consultant, contractor or otherwise) any business or commercial operations of wireline, slick line and braided line operations in the counties [attached as an exhibit to the injunction].

7.  [Parker and Myers] shall not solicit, contact, or accept wireline, slick line or braided line work and/or services, from the Established Customers of [STC] in the states of Oklahoma, Texas, Arkansas, Kansas, Pennsylvania, and Louisiana.

8.  [Parker and Myers] shall not provide, or supervise, advise, manage, or serve as a consultant for businesses who are performing wireline, slick line or braided line work for the Established Customers of [STC] in the states of Oklahoma, Texas, Arkansas, Kansas, Pennsylvania and Louisiana.

The order set the case for trial but otherwise imposed no time limit on its requirements or prohibitions. On April 30, 2015, we granted a stay of proceedings, pending the resolution of this appeal, excepting any proceedings related to the trial court's injunctive relief.

On June 4, 2015, the trial court entered an amended temporary injunction. The amended temporary injunction differed from the original in that it changed the

temporal scope of the restrictions against Parker, providing, "With respect to Defendant Parker only, the restrictions contained in Paragraphs 5–8 [i.e., the non-competition and non-solicitation provisions] shall expire on September 18, 2015." The trial court explained that it was not setting the case for trial in light of the stay.

After this appeal was submitted on oral argument, Parker and STC settled all of their claims against each other. Parker filed an unopposed motion to dismiss his appeal, which we grant. Subsequently, Myers has moved for a partial dismissal of his interlocutory appeal. We decline to partially dismiss a party's interlocutory appeal piecemeal, but do so without prejudice to the trial court's consideration of any motion to dismiss upon remand. *See* TEX. R. APP. P. 42.1(a).

Accordingly, we address the arguments raised by and applicable to Myers in this opinion.

## Discussion

### I. Agreement to Arbitrate

Myers contends that the parties are bound by an enforceable agreement to arbitrate, contained within the APA, and thus the trial court erred in denying their motion to compel arbitration. STC responds that the trial court properly denied the motion to compel arbitration because: (1) Parker and Myers did not present a copy of the entire APA to the trial court during the parties' initial hearing; (2) Myers is

not a party to the APA and thus did not agree to arbitrate STC's claims against him; and (3) STC's claims against Myers are outside the scope of the APA.

## A. Standard of Review

We have jurisdiction to review an interlocutory order denying a motion to compel arbitration. TEX. CIV. PRAC. & REM. CODE ANN. §§ 51.016 (West 2015) (party seeking to compel arbitration "[i]n a matter subject to the Federal Arbitration Act" has right to interlocutory appeal), 171.098(a)(1) (West 2011) (party may take interlocutory appeal of order "denying an application to compel arbitration made under Section 171.021" of Civil Practice and Remedies Code); *see also Ellis v. Schlimmer*, 337 S.W.3d 860, 862 (Tex. 2011) (citing *In re D. Wilson Constr. Co.*, 196 S.W.3d 774, 780 (Tex. 2006) (noting availability of appellate review under the FAA and the TAA)). We review a trial court's order denying a motion to compel arbitration for an abuse of discretion; we defer to its factual determinations that are supported by the evidence and examine questions of law de novo. *Valerus Compression Servs., LP v. Austin*, 417 S.W.3d 202, 207 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (citing *Cleveland Constr., Inc. v. Levco Constr., Inc.*, 359 S.W.3d 843, 851–52 (Tex. App.—Houston [1st Dist.] 2012, pet. dism'd)). To compel arbitration, Myers must establish (1) that a valid, enforceable arbitration agreement exists and (2) that the claims asserted fall within the scope of that agreement. *In re Provine*, 312 S.W.3d 824, 828–29 (Tex. App.—

Houston [1st Dist.] 2009, orig. proceeding); *see also Valerus Compression Servs.*, 417 S.W.3d at 207–08.

### B. Applicable Law

The existence of an enforceable arbitration agreement is a legal question that we resolve by applying ordinary contract principles. *In re D. Wilson Constr.*, 196 S.W.3d at 781; *see also Valerus Compression Servs.*, 417 S.W.3d at 208. A trial court must compel arbitration under an established agreement "*unless it can be said with positive assurance*" that the agreement does not cover the dispute at hand. *In re D. Wilson Constr.*, 196 S.W.3d at 783 (quoting *Prudential Secs. Inc. v. Marshall*, 909 S.W.2d 896, 899 (Tex. 1995) (per curiam) (orig. proceeding)) (emphasis original). We resolve any doubt as to the scope of an agreement in favor of arbitration. *Ellis*, 337 S.W.3d at 862. Finally, "where the parties include a broad arbitration provision in an agreement that is 'essential' to the overall transaction, [courts] presume that they intended the [arbitration] clause to reach all aspects of the transaction—including those aspects governed by other contemporaneously executed agreements that are part of the same transaction." *Pers. Sec. & Safety Sys. Inc. v. Motorola Inc.*, 297 F.3d 388, 394–95 (5th Cir. 2002); *see also Kirby Highland Lakes Surgery Ctr. L.L.P. v. Kirby*, 183 S.W.3d 891, 900–01 (Tex. App.—Austin 2006, orig. proceeding) (citing *Motorola*, 297 F.3d at 395).

## C.    Analysis

### 1.    State of the record

At the outset, STC claims that the trial court acted within its discretion to deny the motion to compel arbitration because Parker and Myers did not attach the entire 62-page APA (with exhibits) to their motion to compel or introduce it at the initial hearing on the motion to compel arbitration. STC argues that we should ignore that STC itself immediately introduced the entire APA agreement a few minutes later as part of its request for a temporary injunction and that the APA is part of our single appellate record from both orders. We decline its invitation. *See Stephens v. Dolcefino*, 126 S.W.3d 120, 133–34 (Tex. App.—Houston [1st Dist.] 2003, pet. denied) (noting that an appellate court considers late-filed evidence if the trial court affirmatively indicates that it accepted or considered the evidence). Here, the trial court memorialized its ruling denying the motion to compel arbitration in a signed written order more than two weeks after the initial arbitration hearing, the temporary injunction hearing, and after Parker and Myers had moved for reconsideration of the trial court's oral ruling. In its written order, the trial court declared that it had considered "the motion, Plaintiff's response, the argument of counsel, *and all other pleadings and evidence before it . . . .*" The trial court also expressly relied on the APA in the order, concluding that STC "is not bringing any claims against the Defendants under the APA." Because the APA

was unquestionably before the trial court, we consider it as well. *See id.* We thus turn to the merit of the parties' arguments.

### 2. Myers as a non-signatory

"As a general rule, an arbitration clause cannot be invoked by a non-party to the arbitration contract." *G.T. Leach Builders, LLC v. Sapphire V.P., LP*, 458 S.W.3d 502, 524 (Tex. 2015) (internal quotation marks and citation omitted). "[The] policy favoring arbitration is strong, but it alone cannot authorize a non-party to invoke arbitration." *Id.* In some circumstances, however, a non-signatory may be permitted to enforce an arbitration agreement. *See, e.g.*, *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 739 (Tex. 2005) (listing "(1) incorporation by reference; (2) assumption; (3) agency; (4) alter ego; (5) equitable estoppel, and (6) third-party beneficiary"); *see also G.T. Leach Builders*, 458 S.W.3d at 524. When the motion to compel arbitration depends on "the existence of a valid arbitration clause between specific parties [the issue] is therefore a gateway matter for the court to decide." *G.T. Leach Builders*, 458 S.W.3d at 524 (quoting *In re Rubiola*, 334 S.W.3d 220, 224 (Tex. 2011)).

In examining whether Myers may invoke the APA's arbitration clause, we note that STC is a signatory to that agreement, and it acknowledges throughout its

petition that the APA is the overarching agreement between the parties.[3] The Texas Supreme Court has held that a claimant "cannot, on the one hand, seek to hold the non-signatory liable pursuant to duties imposed by the agreement, which contains an arbitration provision, but, on the other hand, deny arbitration's applicability because the defendant is a non-signatory." *Meyer v. WMCO–GP, LLC*, 211 S.W.3d 302, 306 (Tex. 2006) (quoting *Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 528 (5th Cir. 2000)). More recently, however, the Texas Supreme Court has held that it is not enough that a claim relates to an agreement containing arbitration clause; the claimant must instead seek "to derive a direct benefit" or a "benefit that stems directly from" that agreement. *G.T. Leach Builders*, 458 S.W.3d at 527.

The APA identified Myers as a person who must execute a retention bonus contract as a condition of closing. Article 9.1(n) and 9.2(g) provide, as a condition of closing the transaction, that "James O. Myers . . . shall have executed and delivered to [STC] a retention bonus contract substantially in the form of Exhibit C hereto (the 'Retention Bonus Contract')." In addition, subsection (j) required

---

[3] Among other references, STC alleges that: "Having signed the APA, Ricky Parker was put on notice of paragraph 9.1(n) which required that . . . James O. Myers . . . execute [a] Retention Bonus Contract . . . . The APA further put Ricky Parker on notice that he . . . would have to agree to Schlumberger's policies and agreements . . . . As contemplated by the APA . . . James Myers signed a Retention Bonus Contract. . . . [A]s a result of his knowledge of the terms of the APA, Ricky Parker knew that James Myers had a fiduciary duty and duties of loyalty to Schlumberger following the acquisition."

Myers to "have executed and delivered [STC's] standard employment documentation for new hires." STC concedes that the ICN agreements were part of that documentation. Without Myers's agreement to these contracts, the deal for Parker Energy would not have closed.

These facts differ from those that the Texas Supreme Court addressed in *G.T. Leach. See id.* at 509–10. There, the Court concluded that sub-contractors who were not signatories to a general contractor's construction contract could not compel arbitration because the claims against them did not require enforcement of the general contract and could stand alone under the sub-contract. *Id.* at 527–30. The Court noted that the plaintiff's claims in that case derived from "separate alleged agreements." *Id.* at 529. Although in this case, STC contends that its claims against Myers depend solely on stand-alone agreements, it concedes that the APA *required* Myers to execute these agreements as a condition both of the sale of the company and of his continued employment, and (with respect to the bonus contract) according to a form attached to the APA. STC identifies Myers's failure to comply with these agreements as the basis for its claims; these agreements, in turn, were required by the APA. Because STC required and obtained, as a condition of closing, Myers's agreement to continue his employment with STC upon the sale of the company on the terms that it required in the ICN agreements

and the Retention Bonus Contract, we conclude that STC received a direct benefit under the APA, a benefit that Myers provided.

Because (1) STC was a signatory to the APA, (2) STC agreed to arbitrate any disputes arising "under or in connection with" that agreement, and (3) Myers's agreement to the employment covenants in the ICN agreements and the Retention Bonus Contract was necessary to consummation of the APA, we hold that the doctrines of estoppel and incorporation by reference apply. *See Meyer*, 211 S.W.3d at 306–07 (applying doctrine of equitable estoppel to motion to compel arbitration by parties who were not signatories to arbitration agreement); *Motorola,* 297 F.3d at 394–95 (arbitration clause in one agreement that is "essential" to an "overall transaction" presumptively applies to "other contemporaneously executed agreements that are part of the same transaction"); *Kirby Highland Lakes Surgery Ctr.*, 183 S.W.3d at 900–01 (same). Accordingly, the trial court erred in denying the motion to compel arbitration on the basis that Myers was not a signatory to the APA.

### 3. Ancillary agreements and covered claims

Myers next contends that the trial court erred in determining that STC's claims were unrelated to the APA. STC responds that Myers's employment agreements, unlike the APA, contain no arbitration clause, and do not refer to the APA. However, as we have discussed, Myers executed these agreements

contemporaneously with, and as contemplated by, the APA. In these circumstances, Myers could rely on the APA's provisions to compel arbitration. *See Meyer*, 211 S.W.3d at 306; *Motorola,* 297 F.3d at 394–95; *Kirby Highland Lakes Surgery Ctr.*, 183 S.W.3d at 900–01. The trial court thus erred in denying Myers's motion to compel arbitration on the basis that his ancillary agreements contain no arbitration clause.

STC further observes that it has sued Myers for claims in tort that are breaches of duties imposed by law and not by contract.[4] In the APA, however, STC agreed that these questions of substance should be heard by the arbitrators. According to the APA, questions as to the scope of the agreement, including questions as to the "existence, validity, interpretation or breach" of the APA and claims "based on . . . tort" arising under or connected with the APA must be arbitrated.

"[T]he question 'who has the primary power to decide arbitrability' turns upon what the parties agreed about *that* matter." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943, 115 S. Ct. 1920, 1923 (1995). "[W]hether parties have agreed to submit a particular dispute to arbitration is typically an issue for judicial

---

[4]    Specifically, STC alleges that Parker (1) aided and abetted Myers in breaching fiduciary duties that Myers owed to STC and (2) tortiously interfered with Myers's ICN agreement and Retention Bonus Contract, that Myers breached fiduciary duties that he owed to STC as an employee, and that both men tortiously interfered with STC's prospective business relations.

20

determination." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 296, 130 S. Ct. 2847, 2855 (2010) (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83, 123 S. Ct. 588, 591 (2002)) (internal quotation marks omitted). But when the parties "clearly and unmistakably provide" to submit arbitrability to the arbitrator, courts must defer to the arbitrator's decision on those issues. *Granite Rock Co.*, 561 U.S. at 301, 130 S. Ct. at 2858; *Howsam*, 537 U.S. at 83, 123 S.Ct. at 591; *In re Labatt Food Serv., L.P.*, 279 S.W.3d 640, 643 (Tex. 2009); *see also Elgohary v. Herrera*, 405 S.W.3d 785, 790 (Tex. App.—Houston [1st Dist.] 2013, no pet.).

Because the parties agreed to submit to arbitration "any controversy, dispute or claim arising under or in connection with" the APA, including questions as to the "existence, validity, interpretation or breach" of the agreement, and because the disputes between the parties arise out of and are connected with the APA, we hold that the APA's arbitration clause applies to STC's claims. We further hold that the APA unmistakably refers questions of the arbitrability of particular claims to the arbitrators. The trial court therefore erred in denying Myers's motion to compel arbitration.

## II. Temporary Injunction

Myers argues that we should vacate the temporary injunction because: (1) Oklahoma, not Texas, law applies, and the parties' non-compete agreements

21

are unenforceable under Oklahoma law; and (2) among other defects, the temporary injunction is improperly open-ended, given the finite obligations imposed in the parties' non-compete agreements. We agree with the latter contention.

## A. Standard of Review

We review the trial court's temporary injunction for an abuse of discretion, viewing the facts in a light favorable to the trial court's ruling, but applying the law de novo. *Tel. Equip. Network, Inc. v. TA/Westchase Place, Ltd.*, 80 S.W.3d 601, 607 (Tex. App.—Houston [1st Dist.] 2002, no pet.).

"While an appeal from an interlocutory order is pending, the trial court retains jurisdiction of the case and unless prohibited by statute may make further orders, including one dissolving the order complained of on appeal," provided that it may not make an order that (a) "is inconsistent with any appellate court temporary order" or (b) "interferes with or impairs the jurisdiction of the appellate court or effectiveness of any relief sought or that may be granted on appeal." TEX. R. APP. P. 29.5; *see also Tex. Health & Human Servs. Comm'n v. Advocates for Patient Access, Inc.*, 399 S.W.3d 615, 623–24 (Tex. App.—Austin 2013, no pet.). When a party appeals an order that the trial court subsequently modifies or vacates and replaces with another appealable order, we "must treat the appeal as from the subsequent order . . . ." TEX. R. APP. P. 27.3.

**B. Analysis**

Because the trial court amended its temporary injunction while this interlocutory appeal was pending, we treat the appeal as from the amended order. *See* TEX. R. APP. P. 27.3; *see also* TEX. R. APP. P. 29.5.[5]

As an initial matter, Myers argues that the arbitrators, as opposed to the district court, should address the claims for injunctive relief in the first instance, as with all of the other claims. He relies on *J.J. Gregory Gourmet Services, Inc. v. Antone's Import Co.*, 927 S.W.2d 31 (Tex. App.—Houston [1st Dist.] 1995, no writ). In that case, we held that we could not overturn an arbitration award that granted injunctive relief because the agreement did not preclude the arbitrators from granting it. *J.J. Gregory Gourmet Servs.*, 927 S.W.2d at 36.

The facts in this appeal are different. Section 7.5(d) of the parties' APA expressly provides that STC "will be entitled to an injunction, restraining order, or other equitable relief from any court of competent jurisdiction in the event of any breach of" the APA's non-compete terms. Nothing in the APA restricts the trial court from issuing injunctive relief. Because the APA expressly carves out

---

[5] After submission of this case but before Parker settled with STC and before we issued our decision, Parker and Myers moved for review of the amended temporary injunction. Because Rule of Appellate Procedure 27.3 requires us to review the amended temporary injunction instead of the original injunction, we deny that motion as moot.

23

injunctive relief from the matters to be arbitrated, the trial court did not err in proceeding with an injunction hearing. We turn to Myers's substantive challenges.

### 1. Choice of law

Each of the APA, ICN Agreement, and Retention Bonus Contract provides that Texas law applies to the parties' disputes about them. Myers argues that public policy renders these choice of law provisions unenforceable, because the parties "cannot by agreement thwart or offend the public policy of the state the law of which ought otherwise to apply." *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 677 (Tex. 1990). To apply Texas law, he argues, would offend the public policy of Oklahoma, and Oklahoma law would govern this dispute absent the forum selection clauses.

To determine whether to enforce the parties' selection of Texas law, we apply Section 187(2) of the Restatement (Second) of Conflict of Laws:

> The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either
>
> (a)     the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
>
> (b)     application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be

> the state of the applicable law in the absence of an effective choice of law by the parties.

*Id.* at 677–78 (citing RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188 (1971)). Myers concedes that Texas has a substantial relationship to the parties; thus, Section 187(2)(a) is inapplicable. The question we must decide is whether application of Texas law is inconsistent with Section 187(2)(b).

Under Section 187(2)(b), the parties' choice of Texas law is effective unless: (1) application of Texas law is "contrary to a fundamental policy" of Oklahoma, (2) Oklahoma has "a materially greater interest than [Texas] in the determination of the particular issue," and (3) Oklahoma would be the state of the applicable law in the absence of an effective election of law by the parties. RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187(2)(b); *see also DeSantis*, 793 S.W.2d at 678.

In this case, the trial court heard evidence that several states, including Oklahoma, Texas, Arkansas, Kansas, Pennsylvania, and Louisiana, have significant interests in the construction of the parties' agreements, notably because STC does line business in each of these states. Although Parker and Myers based their competing operations in Oklahoma, the trial court found, based on the evidence before it, that Parker, Myers, and Professional Wireline not only solicited but performed work for established customers of STC in Texas and elsewhere. The trial court acted within its discretion in concluding that Oklahoma does not

have a materially greater interest than Texas. Because we have held that the trial court acted within its discretion in applying Texas law, based on the parties' agreed choice of law provisions, we reject Myers's argument that the non-compete agreements are void under Oklahoma law.

### 2. *Scope of injunctive relief*

Myers further contends that the temporary injunction is overbroad and contains unenforceable restraints on trade under Texas law. He observes that the temporary injunction imposes unenforceable "industry-wide" prohibitions on work; unreasonably prohibits him from engaging in broad categories of work, such as janitorial tasks, in the industry; contains unreasonable geographic restraints; and contains no temporal restraint as to him.

We agree. The temporary injunction contains no limitations as to Myers on the duration of its prohibitions against competition and solicitation of STC's customers and employees. They will therefore expire only upon entry of a final judgment or an order of the trial court terminating the injunction. *See*, *e.g.*, *Orechia v. Dinicolantonio*, No. 01-08-00744-CV, 2009 WL 2231691, at *1 (Tex. App.—Houston [1st Dist.] Jul. 23, 2009, no pet.) (per curiam) (mem. op.); *Four Seahorses, LLC v. Spanish Grant Civic Ass'n, Sections 1 & 2, Inc.*, Nos. 14-04-00638-CV, 14-04-00982-CV, 2005 WL 2875249, at *3 (Tex. App.—Houston [14th Dist.] Nov. 3, 2005, pet. denied) (mem. op.).

The non-compete agreements executed by the parties last for a period of one year, post-employment. The ICN Agreements have a tolling provision: if Parker or Myers, respectively, engaged in prohibited competition or solicitation, "the one-year period . . . [is] extended by the period of time for which [that] Employee was in breach so that [STC] has the full benefit of the one-year periods . . . ." The trial court made no finding regarding the date on which Myers first breached any agreement or the duration of that breach. Without the tolling provision, Myers's non-compete agreement will expire in September 2015, but the injunction does not contain any expiration date as to its prohibitions on Myers's activities.

Even if we were to imply a finding that the non-competition and non-solicitation period should be extended, there is no information in the order from which we can imply any finding regarding when such obligations should end. The only information in the amended injunction that might appear to indicate the trial court's reasoning with respect to the timing of Myers's breach or its duration is the trial court's finding that "Myers began meeting with Schlumberger's customers on September 17, 2014." But we cannot infer from this fact alone when the injunction against Myers should or will terminate.

Under Texas law,

[A] covenant not to compete is enforceable . . . [only] to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a

greater restraint than is necessary to protect the goodwill or other business interest of the promisee.

TEX. BUS. & COM. CODE ANN. § 15.50(a) (West 2011).  The trial court's order has the effect of extending indefinitely the one-year post-employment period contained in Myers's ICN Agreement and Retention Bonus Contract, without any findings as to reasonableness or necessity and without any findings as to whether and when the contract provisions for extension of that period were triggered.

Texas law does not permit a trial court to enter an open-ended injunction against competition.  Rather, "[a] covenant not to compete is in restraint of trade and unenforceable on grounds of public policy unless it is reasonable."  *See Juliette Fowler Homes, Inc. v. Welch Assocs., Inc.*, 793 S.W.2d 660, 662 (Tex. 1990), *superseded by statute on other grounds as stated in Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013).  Further, the trial court made no findings whether the restrictions imposed by Myers's ICN Agreement and Retention Bonus Contract were reasonable and necessary to protect the goodwill or other business interests of STC, but Myers further challenged STC's probable right to a permanent injunction on the basis that the agreement was not reasonable as to geographic scope and the substantive work forbidden.

Because the trial court's order enforces covenants not to compete without providing for a reasonable limitation as to time, we hold that the trial court erred in entering it.  Because we reverse the injunction on that basis, we need not reach the

remaining challenges to the injunction, including those relating to its geographic and substantive scope.

## Conclusion

We grant Parker's motion to dismiss his appeal. With respect to Myers, we reverse the trial court's order denying the motion to compel arbitration and its orders granting STC's application for a temporary injunction. We remand the case to the trial court for entry of an order compelling arbitration and staying further non-injunctive proceedings pending completion of the pending arbitration proceedings. All other pending motions are dismissed as moot.


Jane Bland
Justice

Panel consists of Justices Keyes, Bland, and Massengale.