SOUTHWEST RESEARCH
INSTITUTE & Mark E.
Van Dyke, Appellants,

v.

KERAPLAST TECHNOLOGIES,
LTD., Appellee.

No. 04–02–00589–CV.

Court of Appeals of Texas,
San Antonio.

Jan. 8, 2003.

W. Wendell Hall, Dean V. Fleming, Rosemarie Kanusky, Fulbright & Jaworski, L.L.P., San Antonio, for appellants.

Karen L. Watkins, Christopher J. Oddo, Patton G. Lochridge, Lin Hughes, McGinnis Lochridge & Kilgore, L.L.P., Austin, Charles L. Smith, Jenkens & Gilchrist, San Antonio, Donato D. Ramos, Law Offices of Donato D. Ramos, Laredo, for appellee.

Sitting: PHIL HARDBERGER, Chief Justice,[1] PAUL W. GREEN, Justice, SARAH B. DUNCAN, Justice.

Opinion by: PAUL W. GREEN, Justice.

Appellants Southwest Research Institute (SWRI) and Dr. Mark E. Van Dyke bring this accelerated appeal challenging two temporary injunctions broadly prohibiting SWRI and Dr. Van Dyke from researching, publishing, or disseminating information related to the entire field of keratin-based technology. We vacate the temporary injunctions and dismiss the appeal.

## Background

SWRI is a nonprofit research and development organization providing research, engineering, and testing resources for businesses and government agencies. Over a period of approximately ten years, Keraplast Technologies, Ltd. contracted with SWRI for SWRI to undertake several keratin-based research projects.[2] From the results of these projects, Keraplast hoped to obtain a number of patents for keratin and keratin-based products and processes on which Keraplast could build its business. Each research project was detailed by a separate contract describing the terms of the relationship and the scope of the research to be performed.

---

1. Hardberger, C.J., not participating.

2. Dr. Robert Allen Smith, the creative force behind Keraplast, first contracted with SWRI in 1992. He then created Keraplast to carry on the business he believed would result from his initial ideas on keratin-based products.

In 2000, Keraplast and SWRI experienced a difference of opinion regarding the scope of information that Keraplast claimed as its confidential and proprietary property. This dispute was compromised when SWRI assigned two of its keratin-based patent applications to Keraplast. However, SWRI thereafter declined to perform any further research projects for Keraplast, and the contractual relationship was formally terminated on March 30, 2001.

SWRI then began its own program of keratin-based research projects headed by Dr. Van Dyke, who had previously performed much of the Keraplast research. SWRI and Dr. Van Dyke claim they took extraordinary measures to ensure that SWRI's current projects are not based on any confidential or proprietary information belonging to Keraplast. Keraplast contends that Dr. Van Dyke's published and pending papers and speeches and SWRI's patent applications and advertisements show SWRI is using for its own gain, and disseminating to the public, trade secrets that belong to Keraplast.

Keraplast filed suit to prevent SWRI's conduct and obtained two temporary injunctions, prohibiting SWRI and Dr. Van Dyke, respectively, from "publishing, disseminating, or communicating ... any information regarding or relating to Keratin-based technology ..., including without limitation, presentations, interviews, papers, advertisements, electronic or written communication or business inquiries." Keratin-based technology is broadly defined as:

> any technology based on, or associated with technology based on, processed keratinous material or tissue wherein during the processing of the keratinous material the keratin is chemically modified

The temporary injunction against SWRI also prohibits the following acts with respect to keratin-based technology:

> (1) "file any patent application" in the United States or under the patent law of any foreign country;
>
> (2) "initiate any tests or other research to be performed by third parties;" and
>
> (3) "make application for funding of research grants from or submit contract research proposals to any private enterprise or government or public agency."

The injunction order allows SWRI to pursue currently pending patent applications, to continue current in-house research or projects already under contract with third parties, and to continue pursuit of certain research grants and contract proposals already in progress. SWRI and Dr. Van Dyke challenge the temporary injunctions as unwarranted, overbroad, and a prior restraint on free speech.

### Standard of Review

 We review the grant or denial of a temporary injunction for clear abuse of discretion without addressing the merits of the underlying case. *Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex.1993); *Ireland v. Franklin*, 950 S.W.2d 155, 157 (Tex.App.-San Antonio 1997, no writ). At the hearing for the temporary injunction, the applicant is not required to prove that he will prevail at trial but must establish the right to preserve the status quo pending trial on the merits by showing: (1) a probable right of recovery, (2) imminent, irreparable harm in the interim, and (3) lack of an adequate remedy at law. *Sun Oil Co. v. Whitaker*, 424 S.W.2d 216, 218 (Tex.1968); *Ireland*, 950 S.W.2d at 157. We will draw all reasonable inferences from the evidence in a manner most favorable to the trial court's judgment. *Ireland*, 950 S.W.2d at 157. The trial court does not abuse its discretion when it bases its decision re-

garding the existence of a probable right and injury on conflicting evidence in the record. *Id.* (citing *Davis v. Huey,* 571 S.W.2d 859, 862 (Tex.1978)).

The improper use of trade secrets provides a proper basis for an injunction. *Gonzales v. Zamora,* 791 S.W.2d 258, 268 (Tex.App.-Corpus Christi 1990, no writ). However, every order granting an injunction must be specific in its terms and describe in reasonable detail the act or acts to be restrained. TEX.R. CIV. P. 683; *Gonzales,* 791 S.W.2d at 267. In a case involving trade secrets, the injunction must also be narrowly tailored to address the improper use of confidential or proprietary information only. *Id.* at 268. Further, the injunction must not be "framed so broadly as to prohibit the enjoyment of lawful rights." *Kulkarni v. Braeburn Valley West Civic Ass'n,* 880 S.W.2d 277, 278 (Tex.App.-Houston [14th Dist.] 1994, no writ); *see also Ex parte Tucci,* 859 S.W.2d 1, 5–6 (Tex.1993) (free speech "may not be restricted solely on the grounds that its exercise will have the effect of producing imminent and irreparable harm").

## Discussion

A trade secret is broadly defined as "any formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it." *Computer Assoc. Int'l, Inc. v. Altai, Inc.,* 918 S.W.2d 453, 455 (Tex.1996). Key to the definition of a trade secret is the element of secrecy, implying that the information "is not generally known or readily ascertainable by independent investigation." *Rugen v. Interactive Bus. Sys., Inc.,* 864 S.W.2d 548, 552 (Tex.App.-Dallas 1993, no writ). "When money and time are invested in the development of a procedure or device which is based on an idea which is not new to a particular industry, and when that certain procedure or device is not generally known, trade secret protection will exist." *Gonzales,* 791 S.W.2d at 264. However, information generally known and readily available is not protectable, and no trade secret protection is available when the material or procedure at issue has been publicly disclosed. *Id.*

Keratin is a protein found in human hair. It is undisputed that keratin research has been conducted since the early '50s. Hundreds, if not thousands, of articles have been written about its properties and possibilities. In particular, Australian research resulted in the publication of what scientists refer to as the "keratin bible." Hundreds of patents for keratin-based products exist in the United States and throughout the world.

The temporary injunction orders in this case contain such a broad definition of keratin-based technology that, with certain limited exceptions, SWRI and Dr. Van Dyke are effectively prohibited from carrying on or even discussing any keratin-based research that involves the combination of keratin with other materials. SWRI and Dr. Van Dyke showed that a large body of previously published information, including research papers and patents, describes the combination or possible combination of keratin with other materials. Applied literally, the injunctions would prevent SWRI and Dr. Van Dyke from researching or discussing even this public information. Accordingly, the temporary injunctions improperly grant trade secret protection to information that is not appropriate for such protection.

Under proper circumstances, this court may modify an overly broad injunction rather than vacating the trial court's order. *T–N–T Motorsports, Inc. v. Hennessey Motorsports, Inc.,* 965 S.W.2d

18, 25 (Tex.App.-Houston [1st Dist.] 1998, pet. dism'd). However, in this case, Keraplast insisted that because Dr. Van Dyke and SWRI had no previous experience with keratin research prior to the Keraplast projects, all the knowledge they obtained is proprietary and confidential to Keraplast.[3] As a result, Keraplast failed to identify any specific trade secret that should be protected. Therefore, on the record before us, we cannot effectively narrow the temporary injunction orders.

## Conclusion

The trial court's temporary injunction orders are impermissibly overbroad because they do not identify specific trade secrets and prohibit conduct related only to that confidential and proprietary information. We vacate the temporary injunction orders issued against Southwest Research Institute and Dr. Mark Van Dyke and dismiss the appeal.

---

3. The Texas courts have previously rejected this argument. A former employee may use the general knowledge, skills, and experience acquired during employment to compete with a former employer. *T–N–T Motorsports,* 965 S.W.2d at 22; *Gonzales,* 791 S.W.2d at 267; *Numed, Inc. v. McNutt,* 724 S.W.2d 432, 434 (Tex.App.-Fort Worth 1987, no writ). In this case, Dr. Van Dyke was an experienced research scientist before he came to SWRI and began work on the Keraplast contracts. Keraplast may not seek to prevent Dr. Van Dyke from applying his own preexisting experience, skills and knowledge within the field of keratin-based research.