# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-24-00130-CV

---

**Andrew Coney; Mitchell Walker; Brett Udland; Capital City Drug, LLC; and Axia Medical Solutions, LLC, Appellants**

**v.**

**Prodigy Health, LLC, Appellee**

---

### FROM THE 126TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-24-000218, THE HONORABLE CATHERINE MAUZY, JUDGE PRESIDING

---

### M E M O R A N D U M   O P I N I O N

In this trade secrets and unfair competition dispute involving two competing pharmaceutical sales businesses, Andrew Coney, Mitchell Walker, Brett Udland, Capital City Drug, LLC, and Axia Medical Solutions, LLC, (collectively, Appellants) appeal a temporary injunction issued in favor of Prodigy Health, LLC. Appellants assert that the trial court abused its discretion by issuing the temporary injunction because it is overbroad and lacks specificity in violation of Texas Rule of Civil Procedure 683. For the following reasons, we will affirm in part, reverse in part, and remand to the trial court.

# BACKGROUND[1]

**Prodigy's business and Coney's professional background**

Prodigy is a nationwide specialty drug wholesaler. Andrew Coney, a pharmacist turned entrepreneur, was the CEO of the drug wholesale company "Mockingbird and Cochran" when discussions about a merger with Prodigy began in October 2021. Prodigy had strong financials but sought to strengthen its sales team, and Mockingbird and Cochran had significant outstanding debt but a successful and experienced sales force, including Coney. The merger finalized in October 2022, and Mockingbird and Cochran integrated into Prodigy to bolster its retail sales business, which sells medications to independent, non-chain pharmacies.

To remain employed following the merger, Coney signed an employment agreement with Prodigy.[2] The agreement provided Coney would become Prodigy's Director of Products[3] in exchange for continued employment following the merger, a $200,000 annual salary (which was $40,000 less than he made as Mockingbird and Cochran's CEO), eligibility for cash-based incentives or bonuses, a phantom unit award,[4] and benefits. It also included terms for severance payments if Prodigy terminated Coney's employment without cause or if Coney left Prodigy for good cause or due to disability.

---

[1] The background facts are derived from the undisputed evidence introduced at the hearing on Prodigy's application for temporary injunction, unless otherwise noted.

[2] Coney's employment agreement was contingent on the successful merger between Prodigy and Mockingbird and Cochran.

[3] Coney later became Prodigy's President of Retail Strategy.

[4] A phantom unit award is an alternative to equity-based incentive plans and can be structured to mimic shares of stock. *Phantom Stock Plan*, Investopedia (June 20, 2024), http://www.investopedia.com/terms/p/phantomstock.asp.

In exchange, Coney agreed not to use or disclose Prodigy's confidential information and not to solicit Prodigy's customers, vendors, or personnel during his employment and for a one-year period following his termination from Prodigy's employment. Coney's employment agreement also included a noncompetition provision. Under its terms, Coney agreed that during his employment with Prodigy and for a one-year period after, he would not, "directly or indirectly," "(a) engage in conduct that is likely or probable to result in the disclosure of proprietary information to a Competing Business;[5] and/or (b) be employed by, work as an independent contractor for, own, receive or purchase a financial interest in, make a loan to, or make a monetary gift in support of, any such Competing Business" within a 30-mile radius of a defined territory, which included Prodigy's corporate headquarters and each county in which Coney worked on Prodigy's behalf.

Mitchell Walker and Brett Udland also began working for Prodigy in October 2022, but neither signed an employment agreement. However, Prodigy maintained that Walker, Prodigy's Director of Purchasing, and Udland, one of Prodigy's retail sales representatives, did sign Prodigy's conflict of interest, ethical conduct, and confidential information policy, which prohibits the disclosure of Prodigy's proprietary and confidential information, including Prodigy's customer or employee information, "for personal gain or to compete against Prodigy."

In mid-2023, several of Prodigy's salespeople resigned after Prodigy changed its commission structure per Coney's recommendation. The former Prodigy employees cited the commission change—which effectively reduced their compensation by approximately

---

[5] The employment agreement defined "Competing Business" as a person or entity engaged in the business of a wholesale pharmaceutical distributor that procures and distributes branded and generic drugs to independent pharmacies, hospitals, and clinics.

30 percent—as their reason for leaving. Walker also left Prodigy in September, as did Udland in October. Coney resigned from Prodigy on December 1, 2023.

**The other businesses: Capital City Drug and Axia**

Meanwhile, in September 2022—before the merger completed but after Coney received a draft of Prodigy's proposed employment agreement—Coney created Capital City Drug, LLC. He later testified he wanted to have a drug wholesale company in place to "hedge against any risk of Prodigy firing [him.]" While Coney was still employed by Prodigy, Capital City Drug sold an insulin product primarily in Puerto Rico. However, Coney attested that Capital City Drug had largely paused its business by the end of 2023.

In July 2023, Amy Dang[6] purchased Axia, a California-based LLC that, shortly before the sale, formally changed its stated business from selling dermatological products to selling wholesale prescription drugs. In July and August, as Axia began its drug distribution business, Walker and Coney assisted in its day-to-day operations, and Udland began contacting customers on its behalf—all while still employed by Prodigy.

After Prodigy lost several members of its salesforce, at least seven of those salespeople joined Axia, including Udland. And after Walker left Prodigy, he became Axia's COO. Coney is not formally employed by Axia but has provided consulting services. For their work in 2023, Axia paid Walker $300,000 and Coney $125,000. Axia later paid Coney an additional $475,000, which Coney described as compensation for his services assisting Axia

---

[6] Amy Dang was engaged to Walker at the time of the temporary injunction hearing but is not a party to this appeal.

by recruiting staff, conducting interviews, working with warehouse integration, and purchasing product.

In early December 2023, shortly after discovering that Coney, Walker, and Udland (among others) had either formally joined or provided services to Axia, Prodigy sent cease and desist letters to those three individuals, demanding that all three stop their "conduct constituting misappropriation of trade secrets," that Walker stop his "conduct constituting unauthorized disclosure of Prodigy's confidential information," and that Coney stop his "conduct constituting breach of contract." Coney and Axia responded by suing Prodigy and its lender, Caprice Capital, in California state court, seeking injunctive relief and a declaratory judgment that the conduct Prodigy sought to restrain—including the obligations under Coney's noncompetition agreement—violated California law. The record in this appeal indicates that the California trial court denied the initial request for injunctive relief but does not include a further update on that lawsuit.

**This lawsuit and the temporary-injunction hearing**

On January 12, 2024, Prodigy sued Appellants, asserting claims for conspiracy, misappropriation of trade secrets, breach of fiduciary duties, breach of Coney's noncompetition agreement, tortious interference with business expectancy, harmful access to computer, and violations of the Texas Theft Liability Act. Prodigy also sought injunctive relief, and on February 14, the trial court held a one-day hearing on Prodigy's application for a temporary injunction. Three witnesses testified: Ty Dishman, Prodigy's CEO; Drew Yarborough, Prodigy's IT administrator; and Coney. Dishman testified generally about Prodigy's retail pharmaceutical sales business, including its market space and competitors, the various licensure requirements by each state, the "extensive process" Prodigy went through to receive the requisite accreditation from

5

national pharmaceutical boards, and the enterprise resource planning tool Prodigy "invested a lot of time and energy in" to efficiently run its business. He discussed Prodigy's security measures in place to restrict access to this tool, which contains sales, marketing, and financial information he characterized as "confidential" and "a trade secret."

Dishman testified that Prodigy began an investigation into Axia's business on December 4, 2023, after conversations indicated several of Prodigy's customers, vendors, and former employees had moved to Axia. When asked why he thought Prodigy has lost business to Axia, Dishman answered that "Prodigy's sales decreased by about 90 percent" and Prodigy had lost "at least 500 customers" since July 2023, in addition to several vendors that "ha[ve] migrated over to Axia." Dishman noted that at the time of the temporary injunction hearing, Prodigy had "suffered in the neighborhood of $4.3 million in lost profits," "about $2 million of excess inventory that we normally wouldn't have," a customer base that "no longer believes that we're a reliable resource to sell to them," "an additional $38 million in debt," layoffs of "nine or ten employees," and damage to its "brand" and "company culture." And while Prodigy's retail division had "about 40" employees, Dishman stated it had just nine now, with only two of those being salespeople.

Dishman also testified about Coney, including the employment agreement he signed with Prodigy during its merger with Mockingbird and Cochran. Dishman noted that in addition to compensation and benefits, Coney also received a general release of liability related to a disagreement about whether he owed Caprice Capital approximately two million dollars.[7] As to Coney's time at Prodigy, Dishman described Coney as serving as "the chief advisor for our team, especially the executive team as it related to our understanding and operational strategies in the

---

[7] This amount is described by Coney as approximately $2.5 million.

retail independent pharmacy market space." He noted that Coney "was a trusted individual on the team" and "made lots of recommendations that we followed"; however, Dishman opined that several of Coney's recommendations made in mid-2023 "did not benefit" but rather "hurt" Prodigy. Specifically, Dishman recalled recommendations—which Prodigy adopted—to make "specific large product purchases" and "drastically reduce the commissions paid to [Prodigy's pharmaceutical sales] reps . . . by about 30, 33 percent."

As a result of the commission change, Dishman stated that "within a day or two" of the change, "one of the top sales reps resigned from Prodigy," and "six or seven other sales reps followed suit and resigned" in the following month. Dishman said these resignations caused Prodigy's sales to "drop drastically," as the departing sales force accounted for "about 80 percent" of Prodigy's retail sales division. And Dishman catalogued several departing Prodigy sales representatives who now work for Axia, whom he testified Walker recruited while still employed by Prodigy. Dishman discussed his concerns that recently departed Prodigy employees now working for Axia had access to Prodigy's trade secrets while working for Axia by declining to return their Prodigy-owned computers immediately upon their termination. In particular, after Udland resigned, Dishman discovered Udland had emailed himself spreadsheets that included Prodigy customers and contact information.

Yarborough, Prodigy's IT administrator, testified about Dishman's concerns about Prodigy's technology: he discussed the onboarding and offboarding processes at Prodigy and noted that he determined that both Walker and Udland had accessed their Prodigy-issued computers after their resignations, meaning that Walker and Udland could access anything they had saved locally on those devices.

7

Coney was the last witness to testify. He chronicled his professional background and the various mergers and acquisitions that led him to Prodigy. He discussed lending approximately $2.5 million to Mockingbird and Cochran in 2017 via a promissory note that was due in May 2021. Coney expressed that Caprice Capital was angry about the repayment, wanted him to waive the note, and threatened litigation. In Coney's view, this "sour[ed]" the relationship between him and Caprice Capital, which he said remained "rocky" throughout the merger with Prodigy, when Caprice Capital "forced [him] to give up all [his] equity" and informed him he was "being demoted" with a $40,000 salary cut. Though he acknowledged he was represented by counsel, Coney described feeling "threatened" to sign Prodigy's employment agreement because representatives from Caprice Capital and Prodigy told him that if he declined, he would "be out of a job" and they were "going to sue [him] if [he didn't] do exactly what they asked in a very short time frame." Coney said he thought he "would be sued and probably fired" if he did not sign the agreement, so he did. After Coney expressed that he felt he "didn't think [he] really got anything out of the merger," the trial judge asked:

> The Court: So when they threatened to sue you, they were going to sue you for $2.5 million, a note that you owed, and that's what you got out of signing this, yes or no?
>
> Coney: Yes.
>
> The Court: So you did get something out of signing the employment agreement?
>
> Coney: Yes. I guess in that sense, yes.

After the merger, Coney testified that he felt "largely ignored" and like he "wasn't part of the team" or "involved in high level decisions for Prodigy" such that he saw Prodigy "as a

8

dead-end job." In his view, his job responsibilities at Prodigy did not "have anything to do with sales or contacting customers in any way."

Coney emphasized that all of Axia's customers were derived from a publicly available database—not Prodigy's confidential information—and no Axia salesperson was bound by a noncompetition agreement with Prodigy. Likewise, Coney testified that Axia found its vendors through a publicly available website. But Coney acknowledged that he "assist[ed]" Dang with the Axia purchase, he "do[es] work on behalf of Axia," and Axia "do[es] compete" with Prodigy. Coney also agreed that Axia had paid him approximately $600,000 for his consulting work "based off of overall cash flow of the company," and he "want[s] to be employed by Axia."

Throughout the hearing, the trial court admitted exhibits, including Coney's employment agreement and general release of claims, Walker and Coney's deposition transcripts, Udland's email records, and Prodigy's sales records.

On February 21, the trial court granted Prodigy's application for a temporary injunction,[8] concluding that Prodigy demonstrated a probable right of recovery on the following causes of action:

- breach of contract claims against Coney and Capital City Drug, including breaches of covenants not to compete, not to solicit, not to disclose, and to maintain confidentiality of Prodigy's trade secrets and confidential information;

- breach of fiduciary duties against Coney, Walker, and Udland;

- misappropriation of trade secrets against all Appellants;

---

[8] Because Udland had not yet been served by the temporary injunction hearing, he was not included in the temporary injunction order. After Udland was served, the parties agreed to the entry of a similar temporary injunction against Udland, except that it did not enjoin Udland from working for Axia. On April 11, the trial court entered the parties' agreed order, from which Udland appealed. This Court consolidated the two appeals on the parties' request.

- tortious interference with business expectancy against Coney and Axia;

- harmful access to computer against Udland and Walker;

- Texas Theft Liability Act violations against Udland; and

- conspiracy by all Appellants to commit the above conduct.

The trial court's order issuing the temporary injunction found the evidence established:

- Before resigning from Prodigy, "Coney, Walker, and Udland were all valued and key employees" who "had access to critical confidential and proprietary information of Prodigy, including sales strategies, retail and margin metrics, customer lists, product lists, and employee compensation plans."

- "Coney entered into an agreement that contained confidentiality, non-disclosure, non-competition, and non-solicitation provisions" but "violated these contractual provisions by forming a new company and coordinating with Axia to compete against Prodigy by in [sic] the independent pharmacy retail space."

- While employed by Prodigy, Coney and Walker "developed a scheme . . . to actively solicit business and employees away from Prodigy" and "conspired to solicit business away from Prodigy and direct it to Axia."

- Walker and Udland "signed confidentiality policies and agreed not to disclose Prodigy's confidential information or trade secrets during their employment and after their employment ended," but "they have misappropriated Prodigy's trade secrets and disclosed Prodigy's confidential information to cause harm to Prodigy and for their own benefit," as Walker, Coney, and Udland "now work with Axia and are using Prodigy's confidential information and trade secrets for the benefit of Axia."

- Appellants, "acting individually and in concert, have engaged in an unlawful enterprise with an unlawful purpose of misappropriating Prodigy's confidential information, breaching their fiduciary duties to Prodigy, and wrongfully soliciting Prodigy's customers, vendors, and employees."

- Appellants "have succeeded in stealing customers and hampering vendor relationships and wrongfully disclosing Prodigy's confidential information and trade secret information and are likely to continue to misuse Prodigy's trade secrets and confidential information."[9]

---

[9] The order stated this information includes "customer or client lists, market data related to drug trends and purchases, client sales in the retail space, personnel compensation, information

10

- Without injunctive relief, "Prodigy will suffer imminent and irreparable harm," because, among other things, "the continued improper competition, including engaging in competitive conduct, disclosing Prodigy's confidential information, and soliciting Prodigy employees and customers . . . is ongoing and continuous, which would be difficult to measure and compensate by damages" and involves "irreparable harm to Prodigy's employment relationships, confidential information, goodwill of customers and vendors, and business reputation."

Thus, the trial court found a temporary injunction necessary to preserve the status quo between the parties pending a trial on the merits and ordered that Appellants, "and anyone in concert with them, are prohibited from, directly or indirectly, disclosing or using any confidential or proprietary information of, involving or relating to Prodigy, or its affiliates." It also ordered the following:

a) "Coney is enjoined from working with or for Axia in any capacity, including as a consultant, and Coney is prohibited and enjoined from working for or with Axia, Capital City, or any other direct competitor of Prodigy for one year in the geographic areas in and within a 30-mile radius of the 1,643 zip codes[10] attached to this Order."

b) Capital City Drug "is enjoined from competing against Prodigy in the retail market for one year from the date of this Court's order in the geographic areas in and within a 30-mile radius of the 1,643 zip codes attached to this Order."

. . .

g) "[Appellants] (except Udland), and anyone in concert with them, are enjoined from all work for Capital City, Axia, and any related companies involved in Coney's competing

derived from the NCPDP [i.e., National Council for Prescription Drug Programs] list, synthesizing application of NCPDP list into an [enterprise resource planning] system with respect to input controls, territory assignments, user interface, and user experience, pricing, demand data, Prodigy's reconciliation of rebate data, vendor information including contact names and current and historic product purchases and transactions, reconciliation of product purchases in the retail space, market shares, regulatory information, including pharmacy and vendor licensing information, past, present, and future potential customers inputted into prospect lists, vendor lists, and retail independent customers."

[10] Dishman testified that Prodigy's customers are in these 1,643 zip codes, which Prodigy represents is a "small percentage" of the total 41,683 zip codes in the United States.

enterprise, including any consulting work or work as an independent contractor or employee."

h) Appellants "are enjoined from directly or indirectly soliciting any of Prodigy's employees for employment at Capital City or Axia or related Coney competing enterprise entities."

i) Appellants "are enjoined from soliciting Prodigy's customers."[11]

Appellants filed this accelerated interlocutory appeal challenging the temporary injunction. Soon after, Appellants moved for an emergency stay of the injunction or alternatively a stay of subsection (g) as it pertained to Walker specifically. This Court granted the motion on alternative grounds—by suspending enforcement of subsection (g) as it relates to Walker—so Walker has not been enjoined from working for "Capital City, Axia, and any related companies involved in Coney's competing enterprise, including any consulting work or work as an independent contractor or employee." *Coney v. Prodigy Health, LLC*, No. 03-24-00130-CV, 2024 WL 816697, at *1 (Tex. App.—Austin Feb. 27, 2024, order) (per curiam). In effect, Walker has been able to remain in his COO position at Axia during the pendency of this appeal.

## STANDARD OF REVIEW

A temporary injunction is an "extraordinary remedy" designed to "preserve the status quo of the litigation's subject matter pending a decision on the merits." *Taylor Hous. Auth. v. Shorts*, 549 S.W.3d 865, 877 (Tex. App.—Austin 2018, no pet.) (citing *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002)). "To obtain a temporary injunction, the applicant must plead and prove (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim." *State v. Loe*, 692 S.W.3d 215,

---

[11] The temporary injunction also provided for the return of Prodigy's documents and devices and the preservation of relevant communications, which are not at issue in this appeal.

226 (Tex. 2024) (citing *Butnaru*, 84 S.W.3d at 204). "The Rules of Civil Procedure provide safeguards against an overreaching temporary injunction," including that "its terms must be reasonably specific and describe the acts restrained in detail." *Harley Channelview Props., LLC v. Harley Marine Gulf, LLC*, 690 S.W.3d 32, 37 (Tex. 2024) (citing Tex. R. Civ. P. 683).

We review "each aspect of the trial court's injunction for an abuse of discretion." *Texas Educ. Agency v. Houston Indep. Sch. Dist.*, 660 S.W.3d 108, 116 (Tex. 2023) (citing *Butnaru*, 84 S.W.3d at 204). A trial court abuses its discretion by acting arbitrarily or unreasonably, without reference to any guiding rule or principle, or by misapplying the law to the facts. *DHJB Dev., LLC v. Graham*, No. 03-18-00343-CV, 2018 WL 5987150, at *1 n.2 (Tex. App.—Austin Nov. 15, 2018, pet. dism'd) (mem. op.) (citing *Samlowski v. Wooten*, 332 S.W.3d 404, 410 (Tex. 2011)). That is, "we defer to the trial court's factual findings if they are supported by the evidence, but we review legal determinations de novo." *Loe*, 692 S.W.3d at 226. We must view all evidence in the light most favorable to the trial court's ruling and defer to the trial court's resolution of any conflicting evidence. *Taylor Hous. Auth.*, 549 S.W.3d at 878. To that end, a trial court does not abuse its discretion if some evidence—even if it is conflicting evidence—reasonably supports its decision. *Id.*; *see Butnaru*, 84 S.W.3d at 211.

## DISCUSSION

In Appellants' first issue, they argue that the trial court abused its discretion by granting the temporary injunction because it is overbroad for four reasons: (1) it imposes noncompete obligations on Walker, who is not bound by a noncompete agreement; (2) it imposes non-solicitation obligations on Walker, Udland, and Axia, who are not contractually bound to such terms; (3) the non-solicitation restrictions are overly broad; and (4) three of the enjoined activities

13

lack a temporal limitation.  In Appellants' second issue, they argue that the temporary injunction fails to comply with the specificity requirements of Texas Rule of Civil Procedure 683 by leaving the following terms undefined: "any other direct competitor of Prodigy"; "confidential information" and "trade secrets"; "employees"; and "customers."

### A.  Whether Appellants have waived their arguments

As an initial matter, Prodigy contends that Appellants waived both issues by failing to raise them with the trial court first.[12]  To preserve an issue for appeal, the record must demonstrate that "the complaint was made to the trial court by a timely request, objection, or motion . . . with sufficient specificity to make the trial court aware of the complaint," and that the trial court ruled on the motion, "either expressly or implicitly," or refused to rule and the complaining party objected to its refusal.  Tex. R. App. P. 33.1(a)(1)–(2).

While this appeal was pending, Appellants filed a motion to modify or dissolve the temporary injunction with the trial court, in which they raised the same arguments as in their appellate brief.  *See* Tex. Civ. Prac. & Rem. Code § 51.014(b) (excluding subsection (a)(4) from interlocutory appeals subject to stay of proceedings in trial court); Tex. R. App. P. 29.6 (noting appellate court may review further appealable interlocutory order concerning same subject matter entered while appeal from first interlocutory order is pending).  Appellants then supplemented the

---

[12]  As to Appellants' Rule 683 challenge, "[u]nder this Court's longstanding precedent, a complaint of noncompliance with this requirement of Rule 683 is considered one of form that is waived unless preserved before the trial court."  *Taylor Hous. Auth. v. Shorts*, 549 S.W.3d 865, 877 (Tex. App.—Austin 2018, no pet.) (citing *Emerson v. Fires Out, Inc.*, 735 S.W.2d 492, 493–94 (Tex. App.—Austin 1987, no writ)); *see also Hoist Liftruck Mfg., Inc. v. Carruth-Doggett, Inc.*, 485 S.W.3d 120, 124 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (Frost, C.J., concurring) (discussing split among courts of appeals regarding whether party must preserve error on Rule 683 complaint and urging "[t]here is no justification for the Rule 683 exception [embraced by other courts of appeals] to the error-preservation requirement").

clerk's record with that motion and urged in their reply brief that this motion was sufficient "to remedy any procedural defect." Over two months later, Appellants again supplemented the record, this time to include the trial court's order denying their motion to dissolve following a hearing on that motion on January 16, 2025.[13] Appellants' motion to dissolve the temporary injunction and the trial court's denial of it are sufficient to preserve Appellants' issues on appeal.[14] *See* Tex. R. App. P. 33.1(a).

### B. Whether the temporary injunction is overly broad

Appellants argue that the temporary injunction is overbroad because: (1) it creates non-compete obligations for Walker, who did not sign a noncompetition agreement with Prodigy; (2) it improperly imposes non-solicitation obligations on Walker, Udland, and Axia, who are not bound by a non-solicitation agreement; (3) the non-solicitation provision is overbroad in its reach; and (4) three of its provisions lack a deadline.

#### (i) Non-compete obligations for Walker

First, Appellants argue that the temporary injunction violates Texas law by restraining Walker's lawful competitive activity. Appellants specifically take issue with the temporary injunction's language in subsection (g) that enjoins Walker "*from all work* for Capital

---

[13] Appellants received notice that this case had been set for submission on the briefs two days prior, on January 14, 2025.

[14] Appellants filed a separate appeal from the trial court's denial of their motion to dissolve the temporary injunction. We granted Appellants' unopposed motion to consolidate the two appeals and consolidated the later appeal into this one. *See Coney v. Prodigy Health, LLC*, Nos. 03-24-00130-CV & 03-25-00051-CV, 2025 WL 608322, at *1 (Tex. App.—Austin Feb. 26, 2025, no pet. h.) (mem. op.). Because we review the substance of the trial court's order here, we grant Appellants' unopposed motion to review further orders (i.e., the order denying the motion to dissolve).

City, Axia, and any related companies."[15]  They urge that this Court should reverse or—at minimum—reform the temporary injunction to prevent its undue restriction of Walker's work for Axia, which they maintain is lawful absent a noncompete agreement.  Prodigy responds that even without a noncompete agreement, Walker's "breaches of fiduciary duty and conspiracy with Coney to breach Coney's non-compete agreement and steal Prodigy's customers and employees" justifies the trial court's decision to prohibit him from working for Axia.

Unless prohibited by contract, an employee may compete with his former employer after his employment's termination.  *Gonzales v. Zamora*, 791 S.W.2d 258, 268 (Tex. App.—Corpus Christi–Edinburg 1990, no writ); *see Southwest Rsch. Inst. v. Keraplast Techs., Ltd.*, 103 S.W.3d 478, 483 n.3 (Tex. App.—San Antonio 2003, no pet.) ("A former employee may use the general knowledge, skills, and experience acquired during employment to compete with a former employer."); *T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc.*, 965 S.W.2d 18, 22 (Tex. App.—Houston [1st Dist.] 1998, pet. dism'd); *see also Yokogawa Corp. of Am. v. Kinder*, No. CV H-18-1858, 2018 WL 7253968, at *4 (S.D. Tex. July 6, 2018) (collecting Texas cases). "Under the Texas case law, when a former employee misappropriates his employer's trade secrets, the appropriate remedy is to enjoin use and disclosure of those secrets, not to enjoin work in competition with the former employer."  *Anadarko Petroleum Corp. v. Davis*, No. CIV. A. H-06-2849, 2006 WL 3837518, at *24 (S.D. Tex. Dec. 28, 2006) (citing *Southwest*

---

[15] In response to Appellants' emergency motion for temporary relief, this Court stayed this provision of the temporary injunction to the extent that it prohibits Walker from working for Axia. *Coney v. Prodigy Health, LLC*, No. 03-24-00130-CV, 2024 WL 816697, at *1 (Tex. App.—Austin Feb. 27, 2024, order) (per curiam).

16

*Rsch. Inst.*, 103 S.W.3d at 482). Indeed, injunctions in trade-secret[16] or unfair competition cases must be "narrowly tailored to address the improper use of confidential or proprietary information only" and "must not be 'framed so broadly as to prohibit the enjoyment of lawful rights.'" *Southwest Rsch. Inst.*, 103 S.W.3d at 482 (quoting *Kulkarni v. Braeburn Valley W. Civic Ass'n*, 880 S.W.2d 277, 278 (Tex. App.—Houston [14th Dist.] 1994, no writ)); *see In re Krueger*, No. 03-12-00838-CV, 2013 WL 2157765, at *6 (Tex. App.—Austin May 16, 2013, orig. proceeding) (mem. op.) ("[A]n injunction 'must not be so broad as to enjoin a defendant from activities which are a lawful and proper exercise of his rights.'" (quoting *Hitt v. Mabry*, 687 S.W.2d 791, 795 (Tex. App.—San Antonio 1985, no writ))).

Prodigy's allegations of Walker's misconduct aside, it is undisputed that Walker is not contractually prohibited from competing with Prodigy after leaving its employment. Because Walker did not have a noncompetition agreement with Prodigy, the trial court abused its discretion when it enjoined him "from all work for Capital City, Axia and any related companies involved in Coney's competing enterprise, including any consulting work or work as an independent contractor or employee." *See Cooper Valves, LLC v. ValvTechnologies, Inc.*, 531 S.W.3d 254, 263 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (finding abuse of discretion when trial court enjoined appellant without noncompetition agreement from "engag[ing] or participat[ing] in any way in the design, development, or manufacture" of specific types of valves); *cf. Kinder*,

---

[16] We take no position on the merits of Prodigy's trade secrets claim because "[a]t this preliminary stage, the trial court does not determine that the information . . . is a trade secret" but instead "ascertains whether the applicant has established that the information is entitled to trade-secret protection until the trial on the merits." *Center for Econ. Just. v. American Ins. Ass'n*, 39 S.W.3d 337, 343 (Tex. App.—Austin 2001, no pet.); *see also Sharma v. Vinmar Int'l, Ltd.*, 231 S.W.3d 405, 424 (Tex. App.—Houston [14th Dist.] 2007, no pet.) ("The fact that a temporary injunction order was issued granting trade secret protection does not mean the protected information is a trade secret.").

2018 WL 7253968, at *5 (noting that injunction prohibiting defendants' use of confidential information and trade secrets "will protect Plaintiff from further irreparable harm without unduly restricting [former employee's] right to work for [competitor] and [competitor's] right to hire him" notwithstanding defendants' "egregious conduct," including "acting surreptitiously" for new employer while still employed by plaintiff); *Anadarko Petroleum Corp.*, 2006 WL 3837518, at *26 (construing Texas law and declining plaintiff's request for preliminary injunction prohibiting competitor from employing former employee, even assuming record supported finding that former employee breached fiduciary duties by misappropriating plaintiff's confidential information); *Miller Paper Co. v. Roberts Paper Co.*, 901 S.W.2d 593, 602 (Tex. App.—Amarillo 1995, no writ) (upholding temporary injunction when trial court omitted employer's request to "expressly prevent[] competition" by former employees such that former employees were "free to compete but not with the materials developed by or on behalf of" former employer).

We sustain Appellants' issue on this point and reverse the portion of subsection (g) in the temporary injunction that enjoins Walker "from all work for Capital City, Axia, and any related companies."

*(ii)*     *Non-solicitation obligations for Walker, Udland, and Axia*

Further, Appellants argue there is no basis for the trial court's injunction restraining Walker, Udland, and Axia[17] from soliciting all of Prodigy's customers. Though Appellants acknowledge Coney signed a non-solicitation agreement, they maintain no other defendant agreed not to solicit Prodigy's customers and thus cannot be restrained from exercising their legal right to

---

[17] Appellants do not argue that Capital City Drug should be excluded from these provisions of the injunction.

18

do so.  Appellants emphasize that the injunction precludes Axia as a whole—including its many employees who never worked for Prodigy—from soliciting Prodigy's customers, which they contend unlawfully prohibits competition.

Prodigy attempts to distinguish these circumstances—in which Axia formed its business by purportedly using Prodigy's trade secrets—from the cases Appellants cite, involving solicitation of customers that had existing business with the competitor.  Prodigy maintains Axia can be enjoined from soliciting its customers because it participated in and benefitted from the breaches of fiduciary duties by Coney, Walker, and Udland.

However, typically, "an employer is not entitled to an injunction preventing a former employee from soliciting the employer's clients" absent an enforceable noncompete agreement.  *Rugen v. Interactive Bus. Sys., Inc.*, 864 S.W.2d 548, 551 (Tex. App.—Dallas 1993, no writ); *accord Gonzales*, 791 S.W.2d at 268.  As Prodigy points out, there are exceptions where courts have enjoined employees from soliciting their former employers' customers absent a non-solicitation agreement.  *See Kinder*, 2018 WL 7253968, at *5 (construing Texas law and citing *Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Wright*, No. CIV. A. 3:93CV01101-D, 1993 WL 13036199, at *1 (N.D. Tex. July 2, 1993)).  For example, an employee may be enjoined from soliciting his former employer's customers by means of enforcing an existing noncompetition agreement.  *See Lasser v. Amistco Separation Prods., Inc.*, No. 01-14-00432-CV, 2014 WL 4952501, at *10 (Tex. App.—Houston [1st Dist.] Oct. 2, 2014, no pet.) (mem. op.); *Stocks v. Banner Am. Corp.*, 599 S.W.2d 665, 668 (Tex. App.—Texarkana 1980, no writ).  Parties can also agree to the prohibition of the solicitation of former customers.  *See Johnston v. American Speedreading Acad., Inc.*, 526 S.W.2d 163, 165 (Tex. App.—Dallas 1975, no writ).  Or, as Prodigy argues is applicable here, a defendant can be enjoined from contacting her former employer's

19

customers or employees if necessary to protect the employer's confidential information. *See Rugen*, 864 S.W.2d at 551; *see also Wright*, 1993 WL 13036199, at \*4 (applying Texas law and enjoining defendants from soliciting former employer's customers even assuming no non-solicitation agreement existed because successful solicitation would require disclosing confidential information to new employer).

In *Rugen*, a personnel company sued one of its former account managers after she resigned to start a competing firm and the company "noticed that certain documents were missing." 864 S.W.2d at 550. The Dallas Court of Appeals upheld a temporary injunction that enjoined the manager from, among other activities, "calling on, soliciting, or transacting business with consultants employed or retained by [her former employer] or customers of [her former employer]." *Id.* Though the manager protested that the injunction was equivalent to enjoining competition—and the trial court had found her noncompetition agreement unenforceable—the *Rugen* court concluded that the manager was not precluded "from organizing a competing firm and developing her own clients and consultants." *Id.* at 551. Instead, it found that the non-solicitation piece of the injunction "was necessary to protect [the former employer's] confidential information," as the manager had obtained the consultants' and customers' identities solely through her former employer's confidential information. *Id.*

Here, however, the evidence was undisputed that both Prodigy and Axia found customer information from publicly available sources. For example, Dishman (Prodigy's CEO) testified Prodigy "acquired [a customer] list from the Mockingbird & Cochran purchase, as well as repurchased another list from [the National Council for Prescription Drug Programs] NCPDP." Coney confirmed he knew the NCPDP list, a publicly available list for purchase that contains all retailers licensed to dispense prescription pharmaceuticals, was Prodigy's source for retail

customers because he "bought the NCPDP list for [Mockingbird &] Cochran" and after the merger, "[i]t basically became Prodigy retail."

Coney likewise testified that both Axia and Prodigy, like "most" of their retail competitors, find their customers by using the NCPDP data list. He also attested to other means of sourcing customers (e.g., downloading lists of each licensed pharmacy per state, searching for pharmacies on Google maps), but these methods also involved publicly available sources. That is, unlike the manager in *Rugen*, Appellants and Prodigy obtain their customers' identities through publicly available information, not Prodigy's confidential information, and Prodigy did not present conflicting evidence otherwise.[18] Likewise, no evidence supports the conclusion that Appellants obtained information about Prodigy's employees from confidential information.

Given this record, there is no legal or factual basis for applying the exception to the general rule that—absent contractual obligations otherwise—an employer is not entitled to an injunction preventing a former employee from soliciting its customers; thus, the trial court abused its discretion by entering a temporary injunction that enjoins Walker, Udland, and Axia from soliciting "all customers" or "all employees" of Prodigy. *See Kinder*, 2018 WL 7253968, at *5; *Lasser*, 2014 WL 4952501, at *10. We sustain Appellants' issue on this point and reverse subsections (h) and (i) to the extent that they enjoin Walker, Udland, and Axia from "directly or indirectly" "soliciting . . . any of Prodigy's employees for employment" and "soliciting Prodigy's customers."

(iii) *Non-solicitation obligations for Coney*

---

[18] Prodigy points to the exhibits demonstrating that Udland emailed himself spreadsheets including some of its customers' accounts; however, neither those files nor Prodigy's customer list were offered as evidence during the temporary-injunction hearing.

21

Appellants contend that the temporary injunction's non-solicitation provision is overbroad because it prohibits solicitation of "all customers" and "all employees," which Appellants maintain go beyond what is necessary to protect Prodigy's business interests and lacks connection to Coney or Walker's activities when they worked for Prodigy. Having already reversed the portion of the temporary injunction imposing non-solicitation obligations upon Walker, Udland, and Axia, we consider only whether the terms prohibiting Coney's solicitation of "all customers" and "all employees" of Prodigy is overbroad.

The evidence at the temporary injunction hearing included Coney's employment agreement, which contained a non-solicitation provision:

> While employed and for a period of one (1) year following the termination of Employee's employment with Company (whatever the cause), Employee will not (a) directly or indirectly, contact, solicit, or communicate with a Restricted Customer of the Company Group for the purpose of encouraging, causing or inducing such Restricted Customer to cease or reduce doing business with the Company Group, modify their relationship with the Company Group to Company Group's detriment, or divert business (that is the same or substantially similar to Company's and its Affiliates' Business) to a Competing Business; (b) assist any other person or entity in so doing; or (c) accept or do business that is the same or substantially similar to the Company's business with Restricted Customer. "Restricted Customer" is (i) any customer of Company Group during the Lookback Period, and (ii) any potential client of the Company Group, provided any employees of the Company or its Affiliates have had Material Contact with such potential client during the Lookback Period.

It also prohibited Coney from soliciting Prodigy's personnel:

> During Employee's employment with the Company and for one (1) year thereafter, Employee shall not, alone or together with others, directly or indirectly, solicit, induce, influence, or attempt to solicit, induce, or influence any Covered Personnel to: (a) terminate his or her employment or relationship with the Company Group; and/or (b) to go to work for another entity. "Covered Personnel" includes any employee, contractor, or agent of the Company Group that Employee gained knowledge of, or association with[]in the course of Employee's employment with

22

Company. A person shall cease being a "Covered Personal" [sic] upon the termination of their employment by the Company.

Coney also agreed "that the period of time that he is in breach of the[se] provisions . . . shall extend the period of restrictions set forth therein by an equal amount."

Because an employee may be enjoined from soliciting his former employer's customers by means of enforcing a noncompetition agreement, the trial court did not abuse its discretion by temporarily enjoining Coney from soliciting Prodigy's customers and employees to the extent that it prevents him from soliciting "Restricted Customers" and "Covered Personnel" as defined in his employment agreement. *See Kinder*, 2018 WL 7253968, at *4; *Lasser*, 2014 WL 4952501, at *10; *Stocks*, 599 S.W.2d at 668.

We overrule Appellants' issue as it relates to Coney's obligations under subsections (h) and (i) of the temporary injunction.

### (iv) Lack of temporal limitations

Appellants also contend that the temporary injunction is overly broad because the following provisions lack an end date: subsection (g), enjoining Appellants from working for Axia; subsection (h), enjoining Appellants from soliciting Prodigy's employees for employment; and subsection (i), enjoining Appellants from soliciting Prodigy's customers. Because we have already reversed subsection (g) as it applies to Walker (and that provision does not apply to Udland or the corporate entities) and subsections (h) and (i) as applied to Walker, Udland, and Axia, we consider only whether the lack of temporal limitation in subsections (g), (h), and (i) as applied to Coney is impermissibly broad.

First, to the extent that subsection (a)—which restricts Coney's ability to work for Axia for one year from the injunction's date—and subsection (g)—which generally restricts

23

Appellants' work for "Capital City, Axia and any related companies"—conflict, subsection (a)—which *does* include a temporal limitation—controls because it is more specific. *See Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 889 (Tex. 2019). However, subsections (h) and (i)—which prohibit Coney's solicitation of "all customers" and "all employees"—contain no temporal limitation on that restricted activity. The temporary injunction effectively extends Coney's one-year post-employment period in his employment agreement indefinitely without findings about when the provisions for tolling that period were triggered.[19] *See Parker v. Schlumberger Tech. Corp.*, 475 S.W.3d 914, 928 (Tex. App.—Houston [1st Dist.] 2015, no pet.). But "Texas law does not permit a trial court to enter an open-ended injunction against competition." *Id.* Thus, the trial court erred to the extent that subsections (h) and (i) indefinitely extend the non-solicitation provisions in Coney's employment agreement without a reasonable temporal limitation. *See id.* at 929. We sustain in part Appellant's issue on this point.

---

[19] When the trial court issued the temporary injunction in February 2024, it also set the case for a final trial on the merits in November. Had the trial had proceeded in November 2024, the temporary injunction would not have been effectively "open ended," as the prohibitions on Coney's solicitation of Prodigy's employees and customers in the temporary injunction would have ended within a year of Coney's December 1, 2023 termination date from Prodigy—and thus within the one-year limitation in his employment agreement. But because the parties agreed to continue the trial, and because the temporary injunction does not otherwise limit the non-solicitation obligations by reference to Coney's employment agreement, including by determining a date when the tolling period began, it lacks a temporal limitation.

### C. Whether the temporary injunction violates Rule 683

Appellants argue that the temporary injunction fails to comply with the specificity requirements of Texas Rule of Civil Procedure 683 by leaving the following terms undefined: (1) "any other direct competitor of Prodigy" in subsection (a); (2) "confidential information" and "trade secrets" in subsection (c); (3) Prodigy's "employees" in subsection (h); and (4) Prodigy's "customers" in subsection (i).

In addition to other requirements not at issue here, Rule 683 provides:

> Every order granting an injunction . . . shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail and not by reference to the complaint or other document, the act or acts sought to be restrained; and is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

These requirements "mean that an injunction 'must be in clear, specific and unambiguous terms so that the party enjoined can understand the duties or obligations imposed by the injunction and so the court can determine whether the injunction has been violated.'" *Whinstone US Inc. v. Rhodium 30MW, LLC*, 691 S.W.3d 47, 51 (Tex. App.—Austin 2024, no pet.) (quoting *Paul v. Roy F. & JoAnn Cole Mitte Found.*, No. 03-21-00502-CV, 2023 WL 1806101, at \*5 (Tex. App.—Austin Feb. 8, 2023, pet. denied) (mem. op.)); *see Tarr v. Lantana Sw. Homeowners' Ass'n*, No. 03-14-00714-CV, 2016 WL 7335861, at \*11 (Tex. App.—Austin Dec. 16, 2016, no pet.) (mem. op.) ("The purpose of Rule 683 is to adequately inform a party what he is enjoined from doing and why he is enjoined from doing it."). "Determining the level of precision needed depends on the parties' relevant context." *Whinstone US*, 691 S.W.3d at 51. If a temporary injunction does not adhere to Rule 683's requirements, it is subject to being declared void and dissolved. *In re*

*Krueger*, 2013 WL 2157765, at *5 (quoting *InterFirst Bank San Felipe, N.A. v. Paz Constr. Co.*, 715 S.W.2d 640, 641 (Tex. 1986) (per curiam)).

(i)     *"any other direct competitor of Prodigy"*

First, Appellants argue that the temporary injunction violates Rule 683's specificity requirements by failing to define the term "any other direct competitor of Prodigy." Though Appellants' arguments represent that the temporary injunction prohibits all Appellants "from working for or with Axia, Capital City or any other direct competitor of Prodigy," subsection (a)—which applies exclusively to Coney—is the only part of the temporary injunction in which the phrase "any other direct competitor of Prodigy" appears.

Subsection (a) enjoins Coney "from working for or with Axia, Capital City, or any other direct competitor of Prodigy for one year from the date of this Court's order in the geographic areas in and within a 30-mile radius of the 1,643 zip codes attached to this Order." Appellants maintain they "would have to resort to implication and conjecture to interpret this language," as they "could not possibly distill for whom this prevents them from working (other than Axia or Capital City)."

Notwithstanding the fact that the term "Competing Business" is defined in Coney's employment agreement, Coney's own testimony demonstrates that the phrase "any other direct competitor of Prodigy" met the requisite level of specificity given his "relevant context." *See Whinstone US*, 691 S.W.3d at 51. For example, at the temporary injunction hearing, Coney named eight of Prodigy's specific competitors, which he described as "drug wholesalers that are competitors of . . . Axia [and] Prodigy." When asked if Axia and Prodigy are competitors, Coney responded, "we sell to independent pharmacies just like -- yeah, I guess we do compete, yes." He

26

later stated that Axia is "a competitor in the sense that we are a drug wholesaler." In other words, Coney's testimony clarifies that he "understand[s] the duties or obligations imposed by" subsection (a). *See id.*; *see also Lockhart v. McCurley*, No. 10-09-00240-CV, 2010 WL 966029, at *4 (Tex. App.—Waco Mar. 10, 2010, no pet.) (mem. op.) (finding it "reasonable to presume" that individual enjoined from contacting former clients was "sufficiently familiar with the employer's business and its customers to avoid violating the injunction" (quoting *Safeguard Bus. Sys., Inc. v. Schaffer*, 822 S.W.2d 640, 644 (Tex. App.—Dallas 1991, no writ))).

Thus, we cannot conclude the phrase "any other direct competitor of Prodigy" lacks the requisite specificity to comply with Rule 683 in the context of subsection (a) of the temporary injunction, which applies only to Coney. We overrule Appellants' issue as it relates to this language.

### (ii) "confidential information" and "trade secrets"

Next, Appellants argue that the temporary injunction violates Rule 683's specificity requirements by failing to define the terms "confidential information" and "trade secrets" in subsection (c), which states:

> Within 3 days of the Court's order, [Appellants] must return to Prodigy all documents in their possession, custody, or control including emails, and must return any laptops, computers, USB drives, and other external devices that were issued by the Company, including any [. . .] predecessors of the Company, that contain confidential information or trade secrets belonging to Prodigy[,] for forensic imaging by a neutral third-party forensic examiner for which [Appellants] will pay the costs for.

The date for compliance with this provision—with which Prodigy agrees Appellants have "largely complied"—has long passed. "When a temporary injunction becomes inoperative due to a change in status of the parties or the passage of time, the issue of its validity is also moot." *National*

*Collegiate Athletic Ass'n v. Jones*, 1 S.W.3d 83, 86 (Tex. 1999). There is no dispute between the parties as to whether Appellants sufficiently complied with this provision of the temporary injunction, which includes extensive examples of Prodigy's "trade secrets and confidential information."[20] This issue is thus moot. *Id.* We overrule Appellants' issue as it relates to subsection (c) of the temporary injunction.

### (iii) Prodigy's "employees"

Appellants also maintain that the temporary injunction "offers no definition or other way to reasonably identify the 'employees'" in subsection (h). That subsection prohibits Coney[21] from "directly or indirectly, soliciting [ ] any of Prodigy's employees for employment at Capital City or Axia, or related Coney competing enterprise entities." Appellants contend the term is "vague" and "fails to provide reasonable details about the act that it restrains, violating Rule 683." But the cases Appellants cite in support of this argument are distinguishable. *See Hernandez v. Combined Ins. Co. of Am.*, No. 02-20-00225-CV, 2021 WL 520456, at *25 (Tex. App.—Fort Worth Feb. 11, 2021, pet. denied) (mem. op.); *SISU Energy, LLC v. Hartman*, No. 02-19-00436-CV, 2020 WL 4006725, at *16 (Tex. App.—Fort Worth July 16, 2020, no pet.) (mem. op.). For

---

[20] For example, the temporary injunction states that Appellants "are likely to continue to misuse Prodigy's trade secrets and confidential information such as customer or client lists, market data related to drug trends and purchases, client sales in the retail space, personnel compensation, information derived from the NCPDP list, synthesizing application of [the] NCPDP list into an ERP system with respect to input controls, territory assignments, user interface, and user experience, pricing, demand data, Prodigy's reconciliation of rebate data, vendor information including contact names and current and historic product purchases and transactions, reconciliation of product purchases in the retail space, market shares, regulatory information, including pharmacy and vendor licensing information, past, present, and future potential customers inputted into prospect lists, vendor lists, and retail independent customers."

[21] Coney is the only remaining Appellant to which this section applies, given our conclusions above.

28

example, in *SISU Energy*, the Fort Worth Court of Appeals found the trial court abused its discretion by entering an "agreed" temporary injunction when the parties did not consent to the terms of the order at the time. 2020 WL 4006725, at *7. The parties disputed, among other things, which entities the enjoined parties would be restricted from contacting, but the temporary injunction prohibited them from "soliciting any type of employment from, working for, or having a commercial relationship with current and certain former employees and drivers of [appellee]" without providing any means by which "to ascertain the identities of [appellee's] current or former employees or drivers." *Id.* at *16.

Here, however, Coney is prohibited from "soliciting [ ] any of Prodigy's employees for employment at Capital City or Axia, or related Coney competing enterprise entities." Unlike *SISU Energy*, in which the temporary injunction prohibited "commercial relationship[s]," this temporary injunction prohibits only solicitation for employment. *See Eurecat US, Inc. v. Marklund*, 527 S.W.3d 367, 381 (Tex. App.—Houston [14th Dist.] 2017, no pet.) ("Put another way, 'the commonly understood meaning of solicit includes more than merely to ask.'" (quoting *In re Athans*, 478 S.W.3d 128, 135 (Tex. App.—Houston [14th Dist.] 2015, orig. proceeding))). And here, subsection (h) applies only to Prodigy's current employees—not "certain former employees" or unnamed individuals—which, unlike in *Hernandez*, the record establishes was a small group of individuals. For example, Dishman testified at the temporary injunction hearing that Prodigy's retail division had just nine employees left, with only two of those being salespeople.

Under these circumstances, we cannot conclude that the trial court abused its discretion by issuing an order that is "too uncertain when measured against Rule 683" as to the

term Prodigy's "employees." *See In re Luther*, 620 S.W.3d 715, 723 (Tex. 2021). We overrule Appellants' issue on this point.

### (iv) Prodigy's "customers"

In Appellants' final Rule-683 challenge, they argue that the temporary injunction is impermissibly vague by failing to identify Prodigy's "customers" from whom Coney and Capital City Drug—the only remaining Appellants to which this subsection applies, given our above conclusions—are enjoined from soliciting. We agree. The injunction attaches a list of 1,643 zip codes in which its customers are located, but that is insufficient to meet the level of specificity required by Rule 683. Subsection (i) is not "as definite, clear and precise as possible" nor does it "inform the defendant of the acts he is restrained from doing, without calling on him for inferences or conclusions about which persons might well differ and without leaving anything for further hearing." *In re Krueger*, 2013 WL 2157765, at *8 (quoting *Villalobos v. Holguin*, 208 S.W.2d 871, 875 (Tex. 1948)).

Prodigy maintains the facts are unique because Udland emailed a list of Prodigy customers to himself, and Coney was very familiar with Prodigy's retail business and its customers. But the temporary injunction does not restrict the off-limits customers to those on the list Udland sent himself. And because it fails to name or otherwise identify the off-limits customers in reasonable detail, the temporary injunction requires Coney to infer the identity of Prodigy's customers based on his then-existing knowledge of the company's operations. *Id.*; *see Whinstone US*, 691 S.W.3d at 54 ("That specificity gap cannot be filled by resort to the enjoined party's own knowledge of the context of the dispute."); *Computek Comput. & Off. Supplies, Inc. v. Walton*, 156 S.W.3d 217, 222 (Tex. App.—Dallas 2005, no pet.) ("[T]he injunction itself must

provide the specific information as to the off-limits clients, without inferences or conclusions, or . . . implied references to other records [a party] might have."). Plus, unlike an injunction prohibiting an individual from contacting a former employer's clients, subsection (i) also applies to Capital City Drug, which cannot be presumed to have Coney's same knowledge of Prodigy's customers. *See McCaskill v. National Cir. Assembly*, No. 05-17-01289-CV, 2018 WL 3154616, at *4 (Tex. App.—Dallas June 28, 2018, no pet.) (mem. op.) (concluding temporary injunction lacked specificity required by Rule 683 when it enjoined former employee and corporate entity from contacting customers and distinguishing cases involving temporary injunctions not identifying clients by name as enjoining only former employee).

We agree with Appellants that the term "customers," without more, does not provide the requisite level of specificity that Rule 683 mandates. We sustain Appellants' challenge to section (i) of the temporary injunction.

## CONCLUSION

We affirm in part and reverse in part the trial court's order entering the temporary injunction. Specifically, we reverse subsection (g) as it pertains to Walker, subsection (h) as it pertains to Walker, Udland, and Axia, and to the extent that it imposes an indefinite restriction on Coney, and subsection (i) in its entirety. We remand this matter to the trial court for further proceedings consistent with this opinion. *See Cooper Valves*, 531 S.W.3d at 267 (reversing portions of temporary injunction order and remanding to trial court for further proceedings).

31

_____

Rosa Lopez Theofanis, Justice

Before Justices Theofanis, Crump, and Ellis

Affirmed in Part; Reversed and Remanded in Part

Filed:   March 5, 2025